1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10    WILLIE M. FLANIGAN,

11              Plaintiff,                      No.  C 16-00066 WHA

12         v.

13    SAN FRANCISCO POLICE                      **ORDER GRANTING IN PART**
      DEPARTMENT; SERGEANT HOLDER;              **AND DENYING IN PART**
14    SERGEANT TAM; OFFICER HARRIS;             **DEFENDANTS' MOTION FOR**
      OFFICER HICKLIN; SERGEANT RYAN,           **SUMMARY JUDGMENT**
15
              Defendants.
16
      _____

17                         **INTRODUCTION**

18         After a high speed vehicle chase through a crowded downtown city ended in a traumatic

19    crash, pursuing officers ripped plaintiff from his car and forcibly subdued him within

20    constitutional confines.  But sufficient testimony of continued, and excessive, post-custody

21    force precludes summary judgment of plaintiff's claim under 42 U.S.C. § 1983.  Defendants'

22    motion is **GRANTED IN PART AND DENIED IN PART**.

23                          **STATEMENT**

24         Though a prior order recounted the facts, further discovery calls for a retelling (Dkt. No.

25    58).  On the afternoon of October 31, 2014, San Francisco celebrated the Giants' World Series

26    victory.  The parade, which began at the Embarcadero, culminated in a rally at Civic Center

27    plaza.  Blocks away in the packed streets, plaintiff Willie Flanigan drove south on Jones Street

28    in a gray Toyota Highlander SUV, at about 3:15 p.m.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Turning right at Turk Street, Mr. Flanigan hit off-duty San Francisco Police Sergeant Anthony Holder in the crosswalk.  Instead of stopping, Mr. Flanigan continued west on Turk Street before turning right, north, on Leavenworth Street.  Holder called fellow officer Shaughn Ryan, whom he knew to be on duty, to report that a gray Highlander, driven by a black male with no passengers, had hit him in the crosswalk and fled north on Leavenworth.

Ryan, already in uniform nearby, ran to the corner of Eddy and Leavenworth Streets where he indeed saw a gray Toyota Highlander, driven by a lone black male, preparing to turn right onto Eddy.  Ryan approached the vehicle and put his hands up to stop it.  Instead, Mr. Flanigan drove around him and proceeded north.  At 3:19 p.m., Ryan then broadcast the encounter over his radio: "Grey Highlander, going northbound Leavenworth, crossing Ellis. Got a bike rack on the back.  Just did a — uh — hit and run on an officer who was on foot. He's — uh — still northbound, just crossed O'Farrell, heading toward Geary."  Ryan continued, describing the lone driver as a black or mixed race male, and completed his 90-second report at 3:21 p.m.

Turning west onto Geary Boulevard in a nearby marked patrol car at 3:23 p.m., Officers Jared Harris and Brian Hicklin, and Sergeant Conroy Tam saw the gray Toyota Highlander up ahead, also on Geary, just passing Van Ness Avenue.  Driving, Harris activated his lights and sirens to stop the Highlander.  Instead, it sped off (still on Geary), driving through multiple red lights.  Running one of those red lights at the intersection of Geary and Webster Street, the Highlander hit another car but kept going.  Finally, the Highlander smashed into a red pickup truck, headed north through the intersection of Geary and Steiner Street.  Over the course of the impact, the two vehicles rotated about a quarter-turn clockwise before the Highlander pinned the red pickup against a stationary moving van, headed south on Steiner.  The following photo depicts the crash scene, except that emergency responders moved the moving van back from the red pickup to permit the driver to escape.



Immediately after the crash, Harris and Tam jumped out of the patrol car.  Harris let

Hicklin out of the back seat while Tam approached the Highlander, gun drawn.  The driver

door opened, Tam grabbed Mr. Flanigan's wrist, threw him to the ground, and hopped on his

back to immobilize him.  The officers testified at deposition that Mr. Flanigan struggled.  Tam

holstered his gun and tried to grab Mr. Flanigan's arms.  Harris joined, to no avail.  So, Harris

hit him once in the side of the head to distract him.  This move successful, the two handcuffed

Mr. Flanigan just before 3:25 p.m.

Three minutes later, at 3:28 p.m., a San Francisco Fire Department engine arrived and

more emergency responders were on the way.  Officers Holder and Ryan reported being en

route at 3:32 p.m. and later arrived on the scene to identify Mr. Flanigan as the driver they'd

encountered earlier.  When the Fire Department ambulance arrived at 3:43 p.m., the attached

paramedic found plaintiff already treated, sitting in the back of a patrol car in a cervical collar.

According to the officers, that was it.

Mr. Flanigan admitted several key facts at his deposition.  He admitted San Francisco

was "jampacked" that day.  He admitted he drove to evade police.  He did not contest running

several red lights on Geary (Flanigan Dep. at 44, 75–76).  But he also recounted some key

differences.

*First*, Mr. Flanigan swore he did not hit Holder.  Rather, an officer directing traffic

motioned for Mr. Flanigan to turn onto Turk, which he did.  Then, a man in a Giant's jersey

1   (who we now know as Holder) jaywalked through traffic and slammed his hands on the hood

2   of the Highlander as Mr. Flanigan drove by (*id.* at 47–60).

3        *Second*, Mr. Flanigan said he did not collide with another car at the intersection of Geary

4   and Webster (*id.* at 76).

5        *Third*, Mr. Flanigan asserted the red truck *hit him*, the Highlander that is, at the

6   intersection of Geary and Steiner.  He also says a patrol car (presumably carrying Harris, Tam,

7   and Hicklin) also hit the Highlander during the final crash (*id.* at 78–79).

8        *Fourth*, and most importantly, Mr. Flanigan swore Harris, Tam, Hicklin, and Ryan beat

9   him excessively after pulling him from the crash.  Though he complied with their every order,

10  he says, they hogtied him, Ryan kicked him in the face several times, officers hit him over and

11  over in the face and on his body, and one pressed a billy club on the back of his neck while he

12  was on the ground (*id.* at 97–118).

13       Mr. Flanigan filed this § 1983 case *pro se* in January 2016, asserting both unlawful arrest

14  and excessive force.  Magistrate Judge Laurel Beeler granted him leave to proceed *in forma*

15  *pauperis* and, though she initially dismissed his complaint without prejudice, ultimately

16  permitted Mr. Flanigan to proceed with his case.  Following reassignment, the undersigned

17  initially entered judgment for defendants and dismissed Mr. Flanigan's case for failure to

18  maintain his address of record or respond to defendants' September 2016 motion for summary

19  judgment.

20       Following resumed contact with plaintiff, a February 2017 order reopened the case and

21  reinstated defendants' motion for summary judgment.  Following Mr. Flanigan's motion, a

22  June 15 order declined to appoint counsel, noting the undersigned had only the power to

23  request *pro bono* counsel.  Though Mr. Flanigan never officially opposed defendants' motion

24  for summary judgment, even after considerable extensions, the undersigned constructed an

25  opposition from several of his letters.

26       A December 2017 order granted in part and denied in part the motion.  It found no

27  questions remained regarding Mr. Flanigan's arrest.  Given the report of a hit and run on an

28  officer, the high speed chase, running several red lights, and the resulting collateral damage,

United States District Court
Northern District of California

4

1   ample probable cause existed.  It also found Tam was constitutionally permitted to draw his

2   firearm, rip plaintiff from the car, and forcibly subdue the fleeing and potentially dangerous

3   Mr. Flanigan.

4       But the order found genuine questions as to the lawfulness of the rest of the alleged force.

5   Once subdued, handcuffed, and not resisting, plaintiff ceased to be a threat, the order reasoned.

6   Thus, no further violent force could be justified.  Moreover, the order found qualified

7   immunity no barrier to liability, as no reasonable law enforcement officer could have believed

8   the Fourth Amendment would tolerate stomping on, repeatedly kicking and hitting, and

9   choking a handcuffed, hogtied, and compliant individual (as Mr. Flanigan told it).  Last, the

10   prior order denied Holder's motion for summary judgment because if, as Mr. Flanigan alleged,

11   Holder lied about the hit and run, he should have reasonably foreseen the use of force against

12   plaintiff (Dkt. No. 53).

13       Thus, the case proceeded against Holder, Ryan, Harris, Tam, and Hicklin upon the

14   constitutionality of the force (if any) inflicted upon Mr. Flanigan after he was initially subdued.

15   The summary judgment order referred the case for mediation with Magistrate Judge Robert

16   Illman and directed plaintiff's prompt deposition.  When he did not appear, defendants moved

17   to dismiss the case for failure to prosecute.  But plaintiff complained he lacked counsel and

18   feared self-incrimination regarding recently filed criminal charges.  So, a March 2018 order

19   denied the motion to dismiss and referred the case to the Federal Pro Bono Project (Dkt. No.

20   63).

21       An April 20 order appointed willing counsel, David Reidy and Adrian Canzoneri of

22   McGuireWoods, LLP, and again directed Mr. Flanigan's prompt deposition, which finally

23   occurred on July 25 (Dkt. No. 69).  Attorney Stanley Goff joined the team in September.

24   Mediation unsuccessful, the parties engaged in discovery over the next year (Dkt. Nos. 90,

25   102, 105, 107, 111, 113).  In September 2019, Attorney Goff withdrew from the case.  Then in

26   October, both Mr. Reidy and Mr. Canzoneri also withdrew.

27       Because of the substantial discovery following defendant's original motion for summary

28   judgment and the imminent trial, a January 7, 2020, order invited the parties to move again for

United States District Court
Northern District of California

1    summary judgment.  A February 13 order extended the briefing schedule after learning, from

2    one of Mr. Flanigan's letters, of possible video evidence of his initial encounter with Sergeant

3    Holder.  Diligent search found nothing and, lacking a record to support an adverse inference, a

4    March 9 order directed the parties to make do without.

5         Given Mr. Flanigan's incarceration for a different bout of deadly driving, the March 9

6    order also directed defense counsel to contact the warden of San Quentin State Prison to ensure

7    plaintiff's access to the law library while he, now without a lawyer, drafted his opposition.

8    Defense counsel represented that Mr. Flanigan would receive the standard two hours per week.

9    Safety precautions due to the COVID-19 pandemic resulted in modified access, though.

10   Counsel reported that Mr. Flanigan could request research materials each Thursday, which

11   prison library staff would provide within three business days.

12        Following Mr. Flanigan's renewed and repeated complaints regarding lack of counsel,

13   the Court inquired with the San Francisco Federal Pro Bono Project about further

14   representation in this case.  The Pro Bono Project took the matter under consideration, but

15   ultimately declined to re-place Mr. Flanigan with yet further counsel.

16        In the interim, on its own motion, the Court requested and reviewed Mr. Flanigan's full

17   deposition, medical records underlying defendants' experts' testimony, and the parties'

18   supplemental briefing regarding the same.  Mr. Flanigan did not timely respond.  But his

19   subsequent letter revealed his transfer from San Quentin to the California City correctional

20   facility in late May.  So, a June 12 order extended the briefing deadline to give Mr. Flanigan a

21   fair chance to respond.  Following reports of COVID-19 in several of California's prisons, a

22   July 9 order directed counsel to report on Mr. Flanigan's status, including his library access.

23        On July 23, defense counsel reported that Mr. Flanigan remained healthy, had not been

24   diagnosed with COVID-19, that he could request library materials from the library for review,

25   and that Mr. Flanigan had already received two sets of requested materials.  Following an

26   adequate period for response and three letters from Mr. Flanigan in July, this motion has been

27   adequately briefed.

28

United States District Court
Northern District of California

1   In sum, this order follows full briefing from defendants and constructs Mr. Flanigan's

2   response from his multitude of letters.  Due to the public health concern caused by the COVID-

3   19 pandemic, this order was decided on the papers.

4                                   **ANALYSIS**

5           Summary judgment is appropriate if there is no genuine dispute of material fact.

6   Material facts are those "that might affect the outcome of the suit" and "the substantive law's

7   identification of which facts are critical and which facts are irrelevant . . . governs."  A genuine

8   dispute carries sufficient evidence such that a "reasonable jury could return a verdict for the

9   nonmoving party."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986).  But a plaintiff

10  may no longer rely on the complaint to show a dispute of fact — he must "go beyond the

11  pleadings," to affidavits, depositions, written discovery, and admissions for support.  *Celotex*

12  *Corp. v. Catrett*, 477 U.S. 317, 324 (1986); FED. R. CIV. P. 56(c), (e).  "In judging evidence at

13  the summary judgment stage, the court does not make credibility determinations or weigh

14  conflicting evidence.  Rather, it draws all inferences in the light most favorable to the

15  nonmoving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

16      **1.    LEGAL STANDARD.**

17          The Fourth Amendment forbids excessive force — force which is objectively

18  unreasonable in light of the facts and circumstances confronting the law enforcement officers,

19  without regard for underlying intent, motivation, or hindsight.  *See Graham v. Connor*, 490

20  U.S. 386, 394–97 (1989).  The analysis proceeds in three steps: (1) assessment of the severity

21  of the intrusion, *i.e.* the type and amount of forced used; (2) evaluation of the government's

22  interest in the use of force; and (3) balancing the gravity of the intrusion on the individual's

23  rights against the government's need for the intrusion.  *Glenn v. Washington County*, 673 F.3d

24  864, 871 (9th Cir. 2011).

25          Three factors guide the government's interest in the use of force: (1) whether the suspect

26  poses an immediate threat to others; (2) the severity of the crime alleged; and (3) whether the

27  suspect actively resists arrest.  The most important factor, however, remains the immediacy of

28

United States District Court
Northern District of California

United States District Court
Northern District of California

the threat to others.  But these factors are not exclusive.  The entire scenario must be considered.  *Id*. at 872.

As above, the prior summary judgment order divided the alleged force into two categories, pre-custody and post-custody.  It found the pre-custody force reasonable and, relying heavily on Mr. Flanigan's allegations, the post-custody force potentially unreasonable.  Mr. Flanigan, through his deposition testimony, seeks to undermine the first ruling and sustain the second.  Defendants offer contemporaneous police and medical records, expert accident reconstruction, and expert medical evaluation of Mr. Flanigan's medical records to prove the opposite.  Reconciling the parties' accounts requires great care.  Plaintiff's testimony may *only* be discounted if it is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  *See Orn v. City of Tacoma*, 949 F.3d 1167, 1171 (9th Cir. 2020).  Upon due consideration, though the officers used acceptable force to secure Mr. Flanigan in custody and several other officers could not have been present for the alleged excessive force, this order finds that a reasonable jury could still narrowly find the officers used excessive post-custody force.

### 2. PRE-CUSTODY FORCE REASONABLE.

The officers used constitutionally permissible force to secure Mr. Flanigan in custody.  As before, the previous order found that after Mr. Flanigan's reckless and dangerous high-speed chase ended in a traumatic multi-vehicle crash, Sergeant Tam could have reasonably believed Mr. Flanigan remained a threat until subdued.  Thus, Tam could have reasonably drawn his firearm, ripped plaintiff from the Highlander, and forcefully immobilized him on the pavement.

Mr. Flanigan fails to create a genuine dispute of fact.  At deposition, he claimed to be the victim.  He says he stopped the Highlander because a police car blocked the intersection.  Only then did the red pickup crash into him at Geary and Steiner.  But the record flatly contradicts these claims.  No reasonable juror looking at photographs of the crash could conclude the red pickup hit Mr. Flanigan's car.  And, defendants' crash reconstruction expert (with 20 years of experience), Dr. Brian Doherty, confirms this commonsense conclusion:  Mr. Flanigan drove

his Toyota Highlander straight into the passenger door of a red pickup on October 31, 2014. *See Orn*, 949 F.3d at 1171.

Mr. Flanigan satisfied all three primary criteria which usually give the government a reason to use force. He drove to evade police in a crowded city. He ran several red lights. And, he ploughed straight into the passenger door of another car. So, he fled, he drove illegally, and he displayed a callous disregard for the lives of those around him. We are fortunate he killed no one with that Highlander. Sergeant Tam and Officers Harris and Hicklin could have reasonably concluded that Mr. Flanigan remained a flight risk and serious threat to others until they secured him in custody. *See Glenn*, 673 F.3d. at 872.

In response, they used limited force. Plaintiff testified that Tam (with firearm drawn) pulled him out of the car, threw him to the ground, pinned him there with a knee to the upper back and neck, and pulled his arms behind his back before handcuffing him. Harris admitted to striking Mr. Flanigan once on the side of the head as he helped Tam.

On balance, this force was reasonable in the circumstances. Tam drew his firearm to address and approach a potentially dangerous suspect, Mr. Flanigan may have just killed the driver of the red pickup truck. So, Tam pulled plaintiff from the car to counter that threat. He pinned Mr. Flanigan to the ground to prevent a further, and again potentially deadly, escape attempt. And Harris aimed a single blow to distract Mr. Flanigan so that he could be handcuffed. Far from excessive, the officers tailored their use of force to the circumstances.

### 3.   POST-CUSTODY FORCE.

But Mr. Flanigan alleged more. He testified at deposition that *after* Tam and Harris handcuffed him, several officers stomped on his head, kicked and punched him in the face and body, choked him with a billy club, and spat on him. The prior order denied summary judgment for this post-custody use of force, explaining that (under his telling) the secured Mr. Flanigan cooperated and posed no risk. So, the considerable violence alleged served no constitutionally permissible purpose.

At his deposition, Mr. Flanigan explained that once lying handcuffed and with the left side of his face on the ground — not resisting "in any shape, form or fashion" — "I'm seeing

police running towards me.  I start being kicked in the face, stomped, spit on, choked with the billy club.  It became intense."  He says Sergeant Ryan "soccer-kicked" him in the face several times and that all officers kicked him in the forehead, the right side and back of his head.  He also says they stomped on his head the way "a kid would stomp a pumpkin in a pumpkin patch."  Though initially wavering on his testimony that officers "probably hit me in the face a few times with closed fists or something.  I don't know," he later affirmatively testified that officers hit him with closed fists.

But Mr. Flanigan clarified that officers did not place a billy club on his throat to choke him, instead they placed it on the back of his neck to keep him immobilized when Sergeant Tam removed his knee.  Only at that point was Mr. Flanigan finally placed on a gurney and handed to paramedics.  He swore that even as the paramedics arrived to provide medical services, the officers continued to kick him, to "get in the last of their licks before they handed me to the paramedics."  And, Mr. Flanigan asserts hundreds of people stood at the intersection of Geary and Steiner and presumably witnessed his beating.

Finally, Mr. Flanigan testified to his injuries.  The officers fractured the bone around one eye, fractured his nose, busted his lip, and made his ear bled.  He says they injured a rib on his left side, fractured his collarbone, fractured his jaw (resulting in four removed teeth), and fractured bones in both his hands, so he now must wear wrist braces.  Mr. Flanigan says he had no pre-existing hand injuries, that his hands were "in perfect condition prior to this incident."  He also says he now wears glasses, though he "had perfect sight before" October 31, 2014.  Last, he says he suffered several lacerations on his head which needed stiches resulting in bald spots and now suffers from PTSD and regular migraines.

Much of the remainder of record blatantly contradicts this testimony.  This order recognizes that discounting witness testimony at summary judgment rates as an extraordinary step that should not be lightly taken.  *See Orn*, 949 F.3d at 1171.  Upon careful review, though, the contemporaneous medical and law enforcement records, *i.e.* the objective record, permit no other conclusions than that Sergeants Ryan and Holder were not present during the alleged

United States District Court
Northern District of California

excessive force and most of Mr. Flanigan's claimed injuries predate the incident or remain undiagnosed.

Yet, a dispute remains.  It's worth noting that police body camera or other video footage could put this dispute to rest, but we have none and must make do with the record available. Defendants' experts do competently testify, without contest, that the car crash caused Mr. Flanigan's remaining injuries that day.  But this testimony does not foreclose Mr. Flanigan's allegations of excessive force.  Recognizing the *extraordinary* care that must be taken before discounting a plaintiff's testimony of force — lest the Fourth Amendment become meaningless — the expert testimony that the car crash caused Mr. Flanigan's *documented* injuries from Halloween 2014 does not *blatantly contradict* his testimony that officers of the San Francisco Police Department unnecessarily beat him, as now detailed.

### A.   SERGEANTS RYAN AND HOLDER NOT PRESENT.

San Francisco's Department of Emergency Management Computer Aided Dispatch (CAD) records illuminate the incident.  Harris, Tam, and Hicklin reported chasing plaintiff's Highlander at 3:23:20 p.m. that day.  One minute forty seconds later, Tam reported "suspect in custody," just before 3:25:00 p.m.  Three minutes and fifteen seconds later, the first emergency response vehicle, San Francisco Fire Department Engine No. 5, arrived at 3:28:14 p.m.  One ambulance arrived at 3:30:57 p.m. and a second arrived at 3:43 p.m.  Mr. Flanigan admitted in his deposition that the alleged brutality ceased upon his transfer to emergency crew custody. So, the alleged beating lasted just over three minutes, ending just after 3:28 p.m.

Recall, however, Holder and Ryan did not join the chase — they took part in the original incidents, several blocks away from the final crash.  One minute twenty seconds after the crash, Ryan reported he had found Holder who was "fine," at 3:26:20 p.m.  Ryan and another officer then drove Holder to the crash scene to identify Mr. Flanigan as the driver who allegedly hit Holder.  They reported being en route at 3:32:40 p.m., *two minutes after* the *second* emergency response crew arrived at the crash scene.  Simply, even taking every inference in favor of Mr. Flanigan's testimony, the contemporaneous CAD records (which are

11

not susceptible to error and credibility issues which can plague human testimony) establish

conclusively that Holder and Ryan *were not present* during the alleged use of excessive force.

### B. MEDICAL RECORDS CONTRADICT MOST INJURY CLAIMS.

Mr. Flanigan's medical records contradict most of his claimed injuries.  To start, many

claimed injuries predate the incident.  At deposition, Mr. Flanigan swore the officers injured a

rib on his left side and fractured his jaw, collarbone, and both hands.  He also says they

lacerated his head in several places, causing bald spots.  But the medical records of October 31,

2014 report no such injuries — instead they report only the right eye injury and facial trauma

— and it appears no medical professional ever diagnosed and traced those injuries to the crash.

Instead, Dr. Darrell Hayes, defendants' expert in orthopedic surgery, concluded each claimed

injury predated the crash.  He traced Mr. Flanigan's dental complaints to a San Francisco

County Jail request for removal of several teeth in June 2000.  Then, despite Mr. Flanigan's

claims, his medical records detail a litany of hand and wrist injuries: a January 2010 right hand

fracture during a fight; September 2013 injuries to both wrists after jumping out a window; and

substantial October 2013 x-ray evidence of hand and wrist injury.  Dr. Hayes also traced Mr.

Flanigan's claim of a right should injury to a December 2007 fight with another inmate in the

San Francisco County Jail medical records.  Finally, Dr. Hayes traced Mr. Flanigan's scalp

lacerations to a July 2002 fight with another inmate.  In sum, upon review of his complete

medical records, Dr. Hayes concluded Mr. Flanigan suffered none of the claimed jaw, collar

bone, rib, hand and wrist, or scalp injuries on October 31, 2014 (Dkt. No. 147-6).

Mr. Flanigan's last two claimed injuries remain undiagnosed.  Though Mr. Flanigan

claims eyesight injury due to the police action, both Dr. Hayes and Dr. Doherty report that a

trip to the ophthalmologist on November 7, 2014, revealed that Mr. Flanigan retained 20/20

vision.  And, though Mr. Flanigan claims PTSD, this appears to be self-diagnosis unsupported

by any record (*ibid.*, Dkt. Nos. 147-3; 172-3).

### C. THE REMAINING INJURIES.

Defendants contend Mr. Flanigan's only injuries that day came from the car crash.

Plaintiff acknowledged at deposition that the airbag impacted his face and upper torso during

1    the crash.  Contemporaneous medical records report facial trauma and a right eye injury,

2    specifically contusions and abrasions to the left forehead, and a "hematoma to the left frontal

3    scalp."  Mr. Flanigan's right eye was swollen shut with a "periorbital edema/swelling plus

4    ecchymosis with bleeding around the eye."  Doctors also noted "an acute fracture of the nasal

5    septum."  A CT scan further revealed a "moderate right periorbital soft tissue contusion; small

6    left occipital contusion; right orbit comminuted medial blowout fracture;" and mild injury to

7    both the right eye muscle and optic nerve (Dkt. Nos. 147-3; 147-6; 172-3).

8        Dr. Hayes opined these injuries remain consistent with a car crash with airbag

9    deployment, as Mr. Flanigan admits occurred here.  And, Dr. Doherty concluded the right eye

10   "blowout fracture" would have been caused by the Highlander's driver-seat airbag and likely

11   not by an officer's fist or boot.  This is because fists and boots, being more rigid, deliver more

12   "focused forces on the eye or adjacent facial structures," and would cause a localized fracture

13   of the "orbital rim ([the] bony edge of the eye socket)."  On the other hand, the airbag expands

14   and envelopes surfaces, such as the eye, and delivers a distributed (rather than localized) force.

15   The eye squishes, pushes outward, and causes the specific fracture pattern on the "interior

16   walls of the eye socket," *i.e.* a blowout fracture (Dkt. Nos. 147-3; 147-6).

17       Dr. Hayes also helpfully explained that several notations of "kick injury" in Mr.

18   Flanigan's medical records from the date in question do not mean the treating physicians

19   believed Mr. Flanigan had been kicked in the face.  Rather, Dr. Hayes explains a doctor's note

20   of "kick to right eye" in a box labeled "CC" or "chief complaint," in general medical practice,

21   documents the *patient's reported ailment* — not the doctor's conclusion.  Another handwritten

22   note, "multiple kick injuries to [right] midface" similarly documents Mr. Flanigan's report, this

23   conclusion strengthened by the note concluding "unable to take full med[ical] h[istory] due to

24   uncooperativity" (Dkt. Nos. 172-3 at 73–74; 180-2).

25       In essence, defendants urge this order to again discount Mr. Flanigan's testimony.  But

26   this time, instead of asking to discount his largely unfounded (and perhaps Rule 702 barred)

27   accident reconstruction or self-diagnosis of various injuries, defendants ask the Court to

28   discount, as blatantly contradicted by the record, Mr. Flanigan's testimony of his *own*

United States District Court
Northern District of California

13

*experience* of being hit, kicked, and spat on.  Though this order agreed with prior requests, this final one proves a bridge too far.

To start, if pressed, "finders of fact can disbelieve uncontested expert testimony and rely on other, conflicting evidence in the record."  Though, "a finder of fact 'cannot arbitrarily ignore the experts in favor of the observations of laymen.'"  Instead, it must have some basis for disregarding the expert.  *Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 905 (9th Cir. 2004) (Berzon, J., concurring) (quoting *Strickland v. Francis*, 738 F.2d 1542, 1552 (11th Cir. 1984)).

But this order does not decide whether a reasonable jury could disregard the expert testimony because it finds a jury *need not* disregard the expert testimony to rule for Mr. Flanigan.  Even assumed true, Dr. Hayes's and Doherty's testimonies that the car crash caused Mr. Flanigan's noted injuries do not foreclose the possibility that the alleged excessive force dealt lesser injuries than the car crash, such that they would not have manifested as separate injuries in the medical records.  Simply, that all *documented* injuries trace to a single source does not preclude *undocumented* injuries from a different source.

An absence of evidence usually means nothing.  Though non-binding here, the Court of Appeals for the Federal Circuit has well illustrated this point in the context of veterans affairs, in which a servicemember's entitlement to benefits often turns — as does Mr. Flanigan's claim here — on the presence (or not) of injury in contemporaneous medical records.  In *AZ v. Shinseki*, the Federal Circuit explained:

> At common law, the majority of courts held that where circumstances supported the conclusion that "an entry *would naturally have been made*" if a transaction had occurred," then evidence showing the *absence* of an entry "should ordinarily be equivalent to an assertion that no such transaction occurred, and therefore should be admissible in evidence for that purpose."

> \*       \*       \*

> Following this general approach, lower federal courts applying common law evidentiary principles have generally held that "[t]he absence of a record of an event *which would ordinarily be recorded* gives rise to a legitimate negative inference that the event did not occur."

> \*       \*       \*

United States District Court
Northern District of California

14

> Correspondingly, courts have refused to admit evidence of the absence of a record to show that an event did not occur, where it was not reasonable to expect the event to have been recorded.

731 F.3d 1303, 1315–16 (Fed. Cir. 2013).

As the court then recognized, the Federal Rules of Evidence embody that common-law rule. For example, Rule 803(7) provides that "the 'Absence of a Record of a Regularly Conducted Activity' may be evidence that '[a] matter did not occur or exist.'" *United States v. Seng Chen Yong*, 926 F.3d 582, 593 (9th Cir. 2019) (citing FED. R. EVID. 803(7)). And, "Rule 803(10) similarly authorizes admission of evidence of the absence of a public record to prove that 'a matter did not occur or exist.'" *AZ*, 731 F.3d at 1317. Both rules turn "on the high probability of [the records'] accuracy." Specifically, that "[s]uch records are maintained regularly and systematically by persons having a duty to make accurate records and are relied upon in the course of daily operations." *United States v. Rich*, 580 F.2d 929, 938 (9th Cir. 1978). Thus, "basic evidentiary principles preclude treating the absence of a record of an unreported . . . assault as evidence of the nonoccurrence of the assault" unless a record of the assault "*would naturally have been made.*" *AZ*, 731 F.3d at 1315, 1318.

Here we cannot say that Mr. Flanigan's October 31, 2014, medical records comprehensively documented his injuries such that undocumented harm conclusively did not happen. The medical records themselves appear to admit as much, stating the doctors' inability to take a full medical account of Mr. Flanigan "due to uncooperativity" (Dkt. No. 172-3 at 73). Perhaps most telling, though Harris admitted to striking Mr. Flanigan in the head that day, neither Dr. Hayes nor Dr. Doherty's reports identify where the medical records document that injury. A reasonable factfinder could conclude the report missed certain injuries, specifically those inflicted by excessive police force.

At bottom, though, defendants' reliance on their experts tracing all documented injuries to the car crash betrays their fundamental error. *They assume that if Mr. Flanigan experienced excessive force it would necessarily have cause injuries that would have manifested and been documented by the treating physicians.* We must take care to not disregard a real possibility of injury simply because the injury did not manifest in the way we expected. This remains so

15

United States District Court
Northern District of California

1   especially in the context of *post-custody* applications of force, where the pre-custody

2   justification of force has largely dissipated.

3         Handcuffed with Tam on his back, and according to Mr. Flanigan's testimony, with

4   either Tam's knee or a billy club on his neck, the government's interest in further use of force

5   evaporated and we may frankly count ourselves fortunate that Mr. Flanigan is still alive to sue.

6   Mr. Flanigan presented no threat to others.  Having been removed from the Toyota Highlander

7   and restrained, his earlier unlawful activity had totally ceased.  He swore at deposition to his

8   total compliance once in custody.  At this point, as the prior order held and this order reaffirms,

9   other than to maintain the security of custody, the Fourth Amendment tolerated *no further*

10  *application of force*.  *See Glenn*, 673 F.3d at 872.  So, the allegations of beating, kicking, and

11  spitting, even if not forceful enough to leave marks that we might expect, remain excessive.

12        Defendants raise for the first time in their supplemental brief the argument that Mr.

13  Flanigan does not sufficiently demonstrate Harris and Hicklin's integral participation in the

14  alleged beating.  True, officers may not be held liable simply for being present for an

15  unreasonable search or seizure.  Our court of appeals requires "either integral participation or

16  personal involvement."  The record here, however, permits an easy inference of both officers'

17  personal involvement in the alleged post-custody force.  Harris admitted to assisting Tam

18  handcuff Mr. Flanigan, and to striking him on the head.  And Hicklin, let out of the squad car

19  by Harris as Tam pulled Mr. Flanigan from the Highlander, was not a mere spectator at the

20  scene.  Whether or not he delivered any blows, while present he had both the opportunity and

21  duty to intercede in Harris and Tam's reported constitutional violation.  The record here

22  supports an inference of individual liability for all three officers.  *See Jones v. Williams*, 297

23  F.3d 930, 935–38 (9th Cir. 2002) (discussing *Rutherford v. City of Berkeley*, 780 F.2d 1444

24  (9th Cir. 1986)); *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (2000).

25                    **D.    QUALIFIED IMMUNITY DOES NOT BAR LIABILITY.**

26        Even though Mr. Flanigan does adequately testify that the officers violated his Fourth

27  Amendment right against excessive force, the Supreme Court tells us we may not hold an

28  officer liable unless "the right in question was clearly established at the time of the officer's

United States District Court
Northern District of California

1  actions, such that any reasonably well-trained officer would have known that his conduct was

2  unlawful." "[W]e [remain] mindful of the Supreme Court's repeated admonition not to define

3  the right at issue at a high level of generality." *Orn*, 949 F.3d at 1174, 1178.  Nevertheless, the

4  question isn't whether these precise facts have occurred before, "[o]therwise, officers would

5  escape responsibility for the most egregious forms of conduct simply because there was no

6  case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Davis*

7  *v. City of Las Vegas*, 478 F.3d 1048, 1056 (9th Cir. 2007).  Rather, we ask whether the officers

8  had "fair notice of the illegality of their conduct." *Orn*, 949 F.3d at 1178.  Here they did.

9       Though not precisely the same facts, *Davis* provides a similar-enough scenario and

10  additional reasoning to inform the officers of the illegality of their alleged conduct.  There, a

11  handcuffed man resisted an officer's pocket search following a pat-down which had already

12  proved him to be unarmed.  Following some pushing and pulling between the two, the officer

13  threw Davis head-first into a wall and then onto the ground.  There, the officer mounted his

14  back and proceeded to beat Davis, eventually fracturing his neck.  Our court of appeals found

15  there remained "no question" that "from an elementary understanding of the obligations of law

16  enforcement officers toward all individuals," no reasonable officer could have believed that

17  (among others) beating a suspect "while he lay face-down on the ground" would be permitted.

18  478 F.3d at 1051–53, 1056–57.  Fortunately our facts are not so grotesque, but the lesson

19  stands and fairly informs our officers of the illegality of beating a person already handcuffed

20  and pinned to the floor.

21       Moreover, our court of appeals offered further guidance illuminating the illegality of the

22  conduct here, albeit in the context of Davis's state law battery claim:

23            No officer has the rightful prerogative to engage in a malicious
          battery of a handcuffed citizen who is neither actively resisting
24            arrest nor seeking to flee.  Such an action, motivated by hostility or
          willful disregard for the law, is without the officer's circumference
25            of authority, even if ostensibly within [his] ambit of authority.

26  478 F.3d at 1060 (quotation marks omitted).  In sum, no officer facing the circumstances

27  before us — a man handcuffed, pinned to the ground, with a police knee to his back and neck

28  — could have reasonably believed any further beating, kicking, or spitting was permitted.

**4.      SERGEANT HOLDER NOT LIABLE.**

Finally, however, the claim for excessive force against Holder fails.  As above, he took no part in the actual arrest and alleged beating of Mr. Flanigan.  The previous summary judgment order found that a reasonable jury could find Holder had falsely reported the hit and run.  Indeed, Mr. Flanigan swore at deposition that Holder, off-duty in his Giant's jersey for the festivities, jaywalked and slapped the hood of the Toyota Highlander when it drove by.  Instead, Holder reported that he'd been hit by the car to Sergeant Ryan, triggering the day's events.  Even assuming Holder did lie, though, given our updated record, he cannot be liable for the remainder of the day's events.

To begin, "[i]f there is no excessive force claim under *Graham*, there is no excessive force claim at all."  As the officers' pre-custody use of force was appropriate, Holder's conduct beforehand cannot resurrect the claim.  *See Cty. of Los Angeles v. Mendez*, 581 U.S. ___, 137 S. Ct. 1539, 1547 (2017).

Moreover, the eventual alleged excessive force was too attenuated from his instigation.  Officers are, subject to qualified immunity, generally liable for, and only for, the proximate causes of their actions.  *See id.* at 1548.   Yes, the use of force in traffic stops remains foreseeable in many cases.  For example, in *Scott v. Harris*, simple speeding and an errant "Precision Intervention Technique ('PIT') maneuver" rendered the driver a quadriplegic.  550 U.S. 372, 375 (2007).  And in *Orn*, driving without headlights on rendered the plaintiff "paralyzed from the waist down" after an officer's bullet, fired to stop plaintiff's car, "lodged in his spine."  949 F.3d at 1171–73.

Here, however, after Holder reported Mr. Flanigan, two sets of police officers tried (and failed) to stop Mr. Flanigan, Ryan on foot, and Harris, Tam, and Hicklin by car.  In fact, the officers never actually stopped Mr. Flanigan's Highlander.  Mr. Flanigan did — by driving it straight into the red pickup truck.  Then, Harris, Tam, and Hicklin took Mr. Flanigan into custody with acceptable force.  The sequence of events proximately triggered by Holder ended with Mr. Flanigan lawfully in custody.  Only *after* that, on their own initiative, did Harris, Tam, and Hicklin (under Mr. Flanigan's telling) proceed to beat Mr. Flanigan excessively.

18

These events fall too far from Holder's original report and were not foreseeable from his shoes. Under these circumstances, no excessive force liability attaches to Holder.

### 5. PROCEDURAL MATTERS GOING FORWARD.

Restated briefly, Mr. Flanigan originally filed this case *pro se* and then failed to respond to defendants' first motion for summary judgment. The Court reopened the case when plaintiff resumed contact, but even given several extensions he still failed to oppose defendants' motion. So, *the Court* constructed an opposition, permitted parts of his case to proceed, and refused to dismiss his case when Mr. Flanigan didn't show up for his deposition. Instead, the Court referred plaintiff to the San Francisco Bar Association's Federal Pro Bono Project, who found plaintiff counsel. One more attorney joined, giving plaintiff a team of three to see him through discovery. *But they each withdrew about a year later.* Mr. Flanigan has (again) never responded directly to defendants' motion for summary judgment. As before, the Court has constructed his response from his several letters and the specially-requested deposition transcript and medical records from the incident. In sum, Mr. Flanigan has received considerable leniency and accommodation in his prosecution of this case. Yet he raises three procedural complaints.

*First*, Mr. Flanigan complains his former attorneys kept his case file from him. The record shows otherwise. Several of his letters to the Court in January 2020 requested these files. Defense counsel informed his former free counsel's firm, McGuirreWoods, who returned the file on January 29 (in a letter Mr. Flanigan himself submitted) (Dkt. No. 157).

*Second*, Mr. Flanigan requests discovery be re-opened. Discovery closed (after extension) September 13, 2019. Counsel represented plaintiff past that date. Where the Court has imposed a deadline, Rule 16(b)(4) permits modification "only for good cause." "The central inquiry under Fed. R. Civ. P. 16(b)(4) is whether the requesting party was diligent in seeking the amendment." *DRK Photo v. McGraw-Hill Glob. Ed. Holds.,* 870 F.3d 978, 989 (9th Cir. 2017). Here, he was not. Mr. Flanigan's February 27 request to reopen discovery comes five months after it closed. This order understands Mr. Flanigan has many questions about other incidents involving him and the San Francisco Police Department. But it remains

19

1    unclear what information *relevant to this case* Mr. Flanigan seeks or why he could not by

2    diligence obtain it during his year of represented discovery.  Absent good cause, reopening

3    discovery would unduly prejudice defendants.  The request is denied.

4          *Third*, Mr. Flanigan requests reappointment of counsel.  He already received pro bono

5    counsel who saw him through discovery.  Following Mr. Flanigan's request, the Court duly

6    inquired about reappointment of counsel, but the Federal Pro Bono Project recalled his case

7    and declined to reassign counsel.  Mr. Flanigan has burned through three free attorneys

8    already.  The Court will not make further efforts to secure counsel for Mr. Flanigan because it

9    seems clear he was unwilling or unable to work with the free counsel he was already provided.

10                                      **CONCLUSION**

11         Mr. Flanigan drove dangerously through a crowded downtown.  He sped through

12   multiple red lights.  And, he is fortunate he killed no one when he hurdled his Toyota

13   Highlander into the smaller red pickup truck.  Officer Harris, Sergeant Tam, and Officer

14   Hicklin used reasonable force to secure Mr. Flanigan in custody.  Sergeant Ryan wasn't there.

15   Most of Mr. Flanigan's claimed injuries predate the day's events.  And yet, one genuine

16   dispute of fact remains.  Despite substantial evidence that Harris, Tam, and Hicklin did not use

17   further force after they secured Mr. Flanigan in custody, he testified that they continued to kick

18   him, beat him, and spit on him until the moment emergency responders arrived.

19         Before a jury, the police will have a more convincing story than Mr. Flanigan, whose

20   version of the events is largely contradicted by the contemporaneous records and photographs.

21   Even uncontested expert testimony says his injuries stemmed from the car crash, not from

22   mistreatment.  Yet, none of this categorically forecloses the possibility that the officers did beat

23   Mr. Flanigan, along lines he swears occurred once he became subdued.  The weight of

24   evidence militates against Mr. Flanigan, but it is not so conclusive as to smother his own sworn

25   version of events.  In other cases, where there was video footage, the undersigned has been

26   willing to reject such testimony, but no such video or body camera footage exists here.  A jury

27   will have to decide.

28

United States District Court
Northern District of California

20

As to Sergeants Ryan and Holder, summary judgment is **GRANTED**.  However, as to Officer Harris, Sergeant Tam, and Officer Hicklin, summary judgment is **GRANTED IN PART AND DENIED IN PART**.

Given COVID-19 has disrupted our ability to conduct trials in this district, it remains unclear when we will be able to hold the long awaited trial in this case.  A status conference is set for **FEBRUARY 4, 2021 AT 11:00 A.M.**, at which we will set a trial date.

**IT IS SO ORDERED.**

Dated:  August 29, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE